# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | PHILIP G. REINHARD | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 2000 C 50425 | **DATE** | 6/18/2002 |
| **CASE TITLE** | United States ex rel. Patrick Pursley v. Warden Briley | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, petitioner's petition for habeas corpus is denied, terminating case. Petitioner's second motion for subpoena duces tecum [27-1] and motion for evidentiary hearing [28-1] are denied. All pending motions are denied as moot.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | number of notices | Document Number |
| | No notices required. | | |
| X | Notices mailed by judge's staff. | JUN 18 2002 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| X | Mail AO 450 form. | docketing deputy initials | |
| X | Copy to judge/magistrate judge. | 6-18-02 date mailed notice | |
| KS | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |

02 JUN 18 PM 3: 19

FILED-WD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

United States ex rel. )
)
PATRICK PURSLEY, )
)
    Petitioner, )    No. 2000 C 50425
)
        v. )    Judge Philip G. Reinhard
)
KENNETH BRILEY, Warden )
)
    Respondent. )

## MEMORANDUM OPINION AND ORDER

    Patrick Pursley petitions the court for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his conviction of first degree murder entered April 28, 1994, in the Circuit Court of Winnebago County, Illinois. For the following reasons the petition is denied.

## PROCEDURAL HISTORY

    Pursley's conviction was affirmed by the Illinois Appellate Court on October 24, 1996, *People v. Pursley*, 672 N.E.2d 1249 (Ill. App. Ct. 1996), and the Illinois Supreme Court denied leave to appeal on April 2, 1997. *People v. Pursley*, No. 82636, 679 N.E.2d 384 (Ill. 1997) (table). Pursley filed a post-conviction petition that was summarily dismissed by the trial court, and the dismissal was affirmed by the Illinois Appellate Court in an unpublished order on January 19, 1999. *People v. Pursley*, No. 2-97-0984, Resp. Exh. J. The Illinois Supreme Court denied leave to appeal on December 1, 1999. *People v. Pursley*, No. 88344, 723 N.E.2d 1167 (Ill. 1999) (table). Pursley filed this petition for habeas corpus on October 5, 2000, and the state moved to dismiss.

    At the time Pursley filed this petition, a second post-conviction petition raising additional claims was pending before the Illinois Appellate Court. On September 4, 2001, the Illinois Appellate Court rejected all of Pursley's claims, and the Illinois Supreme Court denied leave to appeal on February 6, 2002.

On March 18, 2002, this court granted Pursley leave to file a supplemental habeas petition to add claims raised in Pursley's second post-conviction petition.[1] On April 9, 2002, Pursley filed a motion to amend the petition, together with a list of claims and arguments. Respondent was not directed to respond to the additional claims pending this court's review, but filed, at the court's direction, copies of the trial transcript, Pursley's second post-conviction petition, his appellate brief, the Illinois Appellate Court's order disposing of the second petition, and Pursley's petition for leave to appeal to the Illinois Supreme Court. Subsequently, this court ordered the entire trial record with exhibits be filed in this court. That record was at the Illinois Appellate Court and was then filed with this court.

## EVIDENCE AT TRIAL

To put Pursley's claims in context, the following summary of the evidence at trial is taken from the opinion of the Illinois Appellate Court, *People v. Pursley*, 672 N.E.2d at 1251-53, supplemented with reference to the summary contained in Pursley's brief on direct appeal, Resp. Exh. A at pp. 8-20.

The state opened with the testimony of Diane Winters, a neighbor and friend of Pursley's, who testified that sometime in March of 1993 Pursley had asked her to purchase bullets for his girlfriend's gun because he didn't want them traced to him. The state's principal witness, Becky George, testified that on April 2, 1993, at approximately 10 p.m., she and her boyfriend, Andrew Asher, had been seated in a parked car in front of her brother's apartment in Rockford. As they were talking, a man wearing a blue ski mask with a hood over it approached the driver's door, opened it, pointed a gun at Asher and George, and announced a holdup. George grabbed about $60 from her purse and leaned over to put it on Asher's lap, and Asher reached into his pocket for his wallet. George could see black skin showing around the robber's eyes. George testified that she held out the money toward the robber but the robber did not take it. As she was searching for more money in her purse, she heard two pops, turned toward Asher, and saw him

---

[1]  The Seventh Circuit recently held in *Newell v. Hanks*, 283 F.3d 827 (7th Cir. 2002), that Federal Rule of Civil Procedure 15(c), governs amendment of habeas corpus petitions, and an amendment made after the limitations period has expired will relate back "where the claims in an amended pleading are based on the same core of facts advanced in the original." *Id.* at 834. Relation back is not a problem here, as the Illinois courts did not dismiss Pursley's successive petition as untimely, treating it as "properly filed" and accordingly tolling the one-year limitations period of 28 U.S.C. § 2244(d). By implication, *Newell* also endorses the application of Fed.R.Civ.P. 15(a), requiring that leave to amend "be freely given when justice so requires."

slump over. The robber ran eastward, and George ran to her brother's apartment and called the police.

Rockford police recovered a spent bullet from the car and the coroner recovered a bullet from Asher's shoulder. A forensic scientist determined they had been fired from the same firearm, which could have been an Astra, Baretta or Taurus, most likely a Taurus. The owner of a gun shop testified that on February 5, 1993, he had sold a Taurus pistol to Pursley's girlfriend, Samantha Crabtree. The serial number matched a Taurus pistol seized from Crabtree's home in June of 1993.

Officer Jeffrey Houd testified that on June 10, 1993, he executed a search warrant at an apartment Pursley shared with Crabtree. Houd recovered a Taurus nine-millimeter handgun and a magazine clip, as well as a black hooded sweatshirt, a black duffel bag, a pair of black denim pants, and a document from the Illinois Department of Employment Security with Pursley's name on it.

The state then called Samantha Crabtree, who testified that she had lived with Pursley since August 1992 and had bought the Taurus handgun in February of 1993 for self-protection. She testified that on June 10, 1993 she had been driving her two children, together with Pursley and his two children, to a birthday party. Pursley told her to pull over, and she did. They were being followed by police. Pursley escaped, but the police went with Crabtree back to her apartment.

At this point, anticipating that Crabtree's testimony would contradict a prior statement incriminating Pursley, and that the prosecution would seek to impeach her testimony by introducing Crabtree's prior statement, defense counsel asked the judge to rule on the voluntariness of Crabtree's prior statement before permitting the prosecution to use it. Defense counsel offered Crabtree's affidavit stating that "abusive methods of questioning" had been employed and that her prior statement had been coerced. The court declined to rule on the trustworthiness of Crabtree's written statement, stating that it was for the jury to weigh the conflicting statements.

Crabtree then testified that on the night in question she had been at home with Pursley, Pursley's son Anthony, and Erin, a family friend. They went to sleep at 11:00 or 11:20; Pursley did not leave the house.

As anticipated, the prosecution then confronted Crabtree with the statement she gave police on June 10, 1993. Crabtree acknowledged that she had told police that on April 2, 1993, she and Pursley had driven around looking for a house for Pursley to rob. Pursley had been wearing black combat boots, black jeans, a black hooded sweatshirt, and had a navy blue ski mask with him. After they passed some apartments, Pursley told her to pull over and wait there with the car running. Pursley left the car and walked back toward the apartments they had just passed. Two or three minutes later, Crabtree heard gunshots, and a minute later, Pursley returned to the car and told her to drive. He was holding Crabtree's Taurus handgun in his hand. Driving home, Crabtree made several wrong turns because she was nervous, and Pursley threatened several times to kill her.

Cross-examined by defense counsel, Crabtree testified that she had lied in her statement to the police and in her grand jury testimony. On August 6, 1993, Crabtree had executed an affidavit stating that she had been interrogated for ten or eleven hours, that she was pregnant, tired, sick and "emotionally weak," and that the police had told her that they would drop armed robbery charges against her if she incriminated Pursley.

Officer Mark Schmidt testified that on June 10, 1993, police officers set up surveillance of an apartment Pursley shared with Crabtree. At 1:25 p.m., Pursley and Crabtree entered a vehicle with Crabtree driving, and the officers followed in an unmarked van. The vehicle stopped suddenly and Pursley jumped out and began running. The police were unable to apprehend Pursley, but Crabtree voluntarily agreed to go to the police station. On the way to the station, the police stopped at Crabtree's apartment and searched it pursuant to a warrant.

Crabtree arrived at the station at 3:15 p.m. and was given Miranda warnings at 5:06 p.m. Crabtree told police that Pursley had threatened to kill her and her children. At 6:20 p.m. Crabtree took the police on the route Pursley and Crabtree took the night of Asher's murder. When they returned to the station at 7:45 p.m., Crabtree gave a statement. Schmidt began typing the statement at 8:25 p.m. and Crabtree signed the statement at 11:25 p.m.

Marvin Windham testified that he made an anonymous call to Crimestoppers on June 8, 1993, and related that Pursley had told him he killed Asher. On June 12 after hearing that the police were unable to arrest Pursley, Windham called Crimestoppers again and gave a statement to the police. Windham stated that he had known Pursley about two years. About April 5, 1993, Windham had visited Pursley at his home, heard Pursley talking on the telephone to

someone from the unemployment office. Pursley claimed he was being denied unemployment because he was black. When Pursley got off the phone he said "I am tired of these white peckers, I just killed one the other day, I am going to start killing a lot more." Pursley showed Windham a newspaper clipping about the Asher murder, and told Windham he shot Asher because "they weren't going to give him the purse or wallet but just going to give him the money." Windham admitted that he had two drug convictions and had been charged with domestic battery and disorderly conduct, and acknowledged receiving $2,650 in reward money.

On cross-examination, Windham also acknowledged that he was a cocaine addict. Asked why he waited more than two months to report Pursley's admission, he asserted that Pursley had not threatened him until June. On redirect examination, the prosecutor asked "[w]hen he threatened you in June did he say what he was going to do to you?" Windham answered, "[i]n a way like that before?" The prosecutor then asked, "What did he say?" Windham replied, "[h]e said before he go back to the penitentiary he will know who told, either me or Samantha, and he will ...." Defense counsel's objection was overruled. The prosecutor went on to ask what defendant meant when he threatened Windham and told him that he was "either going to be in or out with him?" Windham replied, "[s]tart doing more crimes." This time the defense's objection was sustained.

Forensic scientist Daniel Gunnell testified that he examined the Taurus pistol, the spent cartridges and the bullets recovered from the crime scene and determined that the Taurus, "to the exclusion of all other firearms" had fired the two cartridge cases. He also testified that the bullets recovered from Asher's body and the car had been fired from the Taurus, although admitted that this was a "judgment call."

Officer Ronald Gillardo testified that on June 16, 1993, he received a Crimestoppers tip that Pursley was walking around the Fairground housing projects, wearing dark clothing and carrying a shotgun. After receiving another tip, he found Pursley hiding under a wheelchair ramp of an abandoned building and arrested him. The state rested.

The defense first called Joyce Tickner, an employee of the Illinois Department of Employment Security office in Rockford. She testified that she had conducted an adjudicatory hearing on Pursley's unemployment claim on April 8, 1993. It is standard practice to document hostile or threatening remarks, and nothing in Pursley's file indicated threats or hostility. It was

stipulated that no newspaper clippings regarding the Asher murder were found in the search of Pursley's home on June 10, 1993.

Mark Boese testified as a firearms expert for the defense. He had examined and test-fired the Taurus handgun and could not conclude that it had fired the cartridges found at the crime scene or the recovered bullets. He opined that the crime scene bullets had been fired from a Taurus handgun, but not the Taurus seized from Pursley's home. On cross-examination, Boese acknowledged that the Taurus was not absolutely excluded, but that he was unable to make a conclusive identification that the bullets from the scene were fired from Crabtree's gun, and he believed that the state's expert did not have a sufficient groove impression to make a conclusive identification.

Several witnesses corroborated Crabtree's testimony that Pursley had been at home on the evening of the murder. Myra Foster, the grandmother of Pursley's nine-year-old son, Anthony, and Tracy Foster, Anthony's mother, testified that on April 2, 1993 Pursley was in Rockford with his son and Aaron, Myra's seven-year-old son; on cross-examination they admitted that two weeks earlier they had told police that they were not sure that Pursley came to Myra's home on April 2.

Penny Bunnell, a friend of Mrs. Foster, testified that on April 2, 1993, she was visiting Mrs. Foster when Pursley picked up Anthony and Aaron around 5:30 p.m. that day. Eleven-year-old Aaron Davis and ten-year-old Anthony Pursley testified that Pursley took them to his house the night of April 2. They stated that they and Pursley played with Anthony's chemistry set until 11 p.m. and that Pursley never left the house. On cross-examination, however, Aaron stated that he thought that April 2 was a Saturday. Both admitted they had told the police that Pursley had picked them up in the afternoon, not at night.

Sixteen-year-old David Bodell testified that he lived in the neighborhood where Asher was murdered. On April 2, 1993, he had heard three gunshots and a woman scream. Shortly thereafter he went outside and saw a man crouched down in front of a dumpster about thirty feet away. Bodell testified that the man was "about six-three," and wore a dark blue sweatshirt and black jeans. The man began running toward an open field and Silent Road Trail when the police sirens "started coming," about thirty or forty seconds after Bodell saw him. Bodell said that the man was about 6' 3" tall and that he could not tell if the man was black or white. On

cross-examination, Bodell stated that the man was "either a white male with a very dark tan or possibly black."

In rebuttal, the prosecution called Harold Packard, an employee of a private detective agency, who had talked with Bodell on April 4, 1994 at the request of defense counsel. Packard estimated that Bodell had been standing about a hundred feet away, not thirty, and that Bodell had told him that the man was black. The state also called investigators who testified to discrepancies between the testimony of two of Pursley's alibi witnesses and their statements to the investigators.

The jury found Pursley guilty, and was he was sentenced to life imprisonment.

## PROCEDURAL STRUCTURE OF HABEAS REVIEW

A federal court may grant a writ of habeas corpus only if the petitioner is in custody in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). Violations of state procedural or evidentiary rules are not grounds for habeas relief unless they result in a constitutional violation. *Estelle v. McGuire*, 502 U.S. 62 (1991); *Gonzalez v. DeTella*, 127 F.3d 619, 621 (7th Cir. 1997). The Constitution entitles a criminal defendant to a fair trial, not a perfect one, *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986), and a fair trial may nevertheless result in the conviction of an innocent person.

Federal habeas corpus serves as a backstop for state courts in protecting a defendant's constitutional rights. Unless each claim has been fairly presented to the state courts, or the failure to do so excused, a federal court may not hear it. The petitioner must have (1) raised the claim in such a way as fairly to apprise the state courts of the constitutional or federal nature of the claim, *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001), (2) appealed the claim to the state's highest court (or, where, as in Illinois, review is discretionary, sought to appeal it), *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999), and (3) complied with the state's procedural requirements. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Schaff v. Snyder*, 190 F.3d 513, 524 (7th Cir. 1999). If a claim fails any of these tests, it has been procedurally defaulted.

A procedural default may be overcome only if petitioner can demonstrate cause for the default and actual prejudice as a result, or demonstrate that failure to consider the claims will

result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Todd v. Schomig*, 283 F.3d 842, 848 (7th Cir. 2002). Only the "cause and prejudice" exception is relevant here.[2/]

To show "cause and prejudice," the petitioner must show a cause for the default external to the petitioner. *Coleman*, 501 U.S. at 753. The petitioner must also show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ouska v. Cahill-Masching*, 246 F.3d 1036, 1050 (7th Cir. 2001) (*quoting United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis in *Frady*).

The most frequent "cause" offered to excuse a procedural default is ineffective assistance of trial or appellate counsel. Nevertheless, failure to raise ineffective assistance of counsel as a separate constitutional claim and present it to the highest state court results in a separate default that, if not itself excused, will prevent the claim of ineffective assistance from excusing the default of the underlying claim. *Edwards v. Carpenter*, 529 U.S. 446 (2000).

Only after each habeas claim clears the hurdles of fair presentation and procedural default may a federal court reach the merits. If the state courts have ruled on the merits of the claim, a federal court may grant the writ only if the state courts' rejection of that claim either

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Factual findings of state courts are presumed correct, and the presumption may be rebutted only by clear and convincing evidence. *Id.* § 2254(e)(1)

Procedurally, Pursley's claims fall into four categories. First are claims raised on direct appeal. To the extent they were presented as federal claims, they are properly before this court.

Second are the claims first raised in Pursley's first post-conviction petition and based on the trial record. The Illinois Appellate Court held that Pursley had waived all claims except his claim of ineffective assistance of appellate counsel because they could have been, but were not,

---

[2/] To show a fundamental miscarriage of justice the petitioner must present new and convincing evidence of innocence showing that a constitutional violation has probably resulted in the conviction of an innocent person. *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 551 (7th Cir. 2001). Although Pursley offers new evidence, it does not meet that standard; at most it undermines the state's evidence.

raised on direct appeal. The Illinois Appellate Court rejected Pursley's claim of ineffective assistance of appellate counsel on the merits, and concluded that the waiver of these claims was not excused. Only if this court finds, contrary to the Illinois Appellate Court, that Pursley received ineffective assistance of appellate counsel, can Pursley establish cause and prejudice permitting consideration of the other claims.

The third category consists of claims first raised in Pursley's first post-conviction petition based on facts *outside* the trial record. Under Illinois law, such claims are not normally barred by *res judicata* or waiver. *See, e.g.*, *People v. Haynes*, 737 N.E.2d 169, 184-85 (Ill. 2000); *People v. Whitehead*, 662 N.E.2d 1304, 1311-12 (Ill. 1996), *overruled in part on other grounds*, *People v. Coleman*, 701 N.E.2d 1063 (Ill. 1998); *People v. Montgomery*, 763 N.E.2d 369, 373 (Ill. App. Ct. 2001).

In the fourth category are new claims raised in the second post-conviction petition that could have been raised in the first one. All such claims were treated as waived by the Illinois courts.

Finally, one claim was first raised in the second post-conviction petition that could not have been raised in the first one: Pursley's claim that his sentence violated the rule of *Apprendi v. New Jersey,* 530 U.S. 466 (2000). However, Pursley did not raise this claim in his motion to amend his petition for habeas corpus and it will not be addressed.

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Because Pursley's claim of ineffective assistance of appellate counsel determines the reviewability of those claims that could have been raised on direct appeal, it will be addressed separately. Claims of ineffective assistance of counsel are decided under the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984), reaffirmed by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000). The petitioner must first show that counsel's representation fell below an objective standard of reasonableness, that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the petitioner must show that counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable. The petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 390-91. In the case of appellate counsel, this translates into a reasonable probability that, but for

counsel's errors, petitioner's case would have been remanded for a new trial or that the decision of the state trial court would have been otherwise modified on appeal. *Howard v. Gramley*, 225 F.3d 784, 790 (7th Cir. 2000).

Although it is necessary to decide whether appellate counsel was ineffective in order to determine whether defaulted, unappealed claims may be reviewed on the merits, the merits of the unappealed claims is nevertheless relevant to the question of ineffective assistance. Failure to appeal a significant and obvious issue without a legitimate strategic reason for doing so indicates deficient performance, *id.*, and the more meritorious the issue, the more likely the petitioner was prejudiced by the failure to raise it. This discussion must accordingly be read together with the court's discussion of the issues Pursley asserts should have been appealed.

Appellate counsel need not, indeed should not, take a "kitchen sink" approach, raising every conceivable issue. *Id.* at 791. There are no perfect trials, and trial judges are necessarily given considerable discretion in their handling of proceedings. Throwing in every conceivable claim of error, cluttering the brief with issues having no chance of success, is merely distracting, and is not the mark of a competent attorney. *Id.*

Pursley's appellate counsel produced a well-argued, 58-page brief raising five main issues, some with additional sub-issues. Letters from Pursley's appellate counsel dated March 20 and May 14, 1996, attached as exhibits to Pursley's brief, indicate that he considered and rejected additional issues proposed by Pursley. In the May 14 letter, counsel states that "I believe the issues you wanted to raise that I did not, for the most part, related to evidence and facts not in evidence in the trial court, and therefore are not presentable on appeal."

Pursley asserts his appellate counsel was ineffective because he did not incorporate into the appellate record certain photographs which showed that the bullets and casings did not match. This was not a proper issue for appeal. It was for the jury to weigh the conflicting expert testimony; it would not be reweighed on appeal.

Pursley next objects that appellate counsel did not make an argument based on police photographs taken near the scene of the crime showing tennis shoe prints in the snow, and did not make those photographs part of the record on appeal. Pursley argues that the prints shown in the photographs were made by tennis shoes, while he was wearing combat boots, and showed that the perpetrator ran in a different direction from that in which Pursley was supposed to have fled.

Contrary to Pursley's assertion, the photographs of the tennis shoe prints were in the record in the Appellate Court.

In arguing that the evidence against Pursley was insufficient, Pursley's appellate counsel did argue from Bodell's testimony that a man having a different description ran toward an open field rather than towards the road where Crabtree said she had waited for Pursley. If the prints in the snow were those left by the man Bodell saw, the fact that they did not match Pursley's boots would have been only one additional piece of evidence that the man Bodell saw was not Pursley. Having examined People's exhibits 58 and 59, the photographs of the two tennis shoe prints, and the transcripts of the trial proceedings, this court does not believe failing to add the tennis shoe evidence to the appellate argument on sufficiency of the evidence caused any prejudice. The two tennis shoe prints were found near a dumpster located some sixty to eighty feet from the vehicle where the victim was killed. The prints went nowhere, did not match each other, and were in an area used by many residents of the apartment complex.

Under *Strickland*, 466 U.S. at 689, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." The Illinois Appellate Court's ruling that Pursley received effective assistance of appellate counsel was not an unreasonable application of *Strickland*. Accordingly, claims that could have been raised but were not raised on direct appeal and consequently treated as waived by the Illinois courts cannot be addressed here.

Pursley's remaining claims will be addressed in order. For the sake of brevity, some claims may be rejected on the merits without determining whether they were properly presented to the Illinois courts. *See Howard v. O'Sullivan*, 185 F.3d 721, 724 (7th Cir. 1999).

## CLAIMS RAISED IN THE ORIGINAL HABEAS PETITION

### I. Pursley was denied due process when the prosecution presented a distorted picture to the grand jury in order to obtain an indictment.

Pursley asserts that the prosecution withheld relevant information from the grand jury when it sought to indict him. Although it could have been raised on direct appeal, this claim was first raised in Pursley's post-conviction petition and has been defaulted. It is also frivolous. A grand jury proceeding is not a trial, and the prosecution has no obligation to present an unbiased

picture. The function of the grand jury is only to determine whether there is probable cause to prosecute, and in reality it has become an investigative tool of the prosecutor's office:

> The grand jury was originally understood as a protection for people accused of crime, just like the petit jury. The modern reality is different. The grand jury is an investigative tool of the prosecutor, enabling him to obtain the testimony of witnesses in secret and under oath, without the presence of lawyers to coach or shield them. Instances in which grand juries refuse to return indictments at the request of the prosecutor are almost as rare as hen's teeth.

*Tyson v. Trigg*, 50 F.3d 436, 440-41 (7th Cir. 1995). In any event, any error was harmless, since Pursley's conviction established the existence of probable cause to prosecute him. *United States v. Rosario*, 234 F.3d 347, 352 (7th Cir. 2000).

## II. The trial court abused its discretion in denying Pursley fourteen peremptory challenges.

This claim is similarly defaulted because it was not raised on direct appeal. It is also frivolous, since Pursley alleges, at most, a violation of Illinois' rules of criminal procedure. The Supreme Court has held that while the peremptory challenge is part of our common-law heritage, "such challenges are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension." *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000). Denying a defendant a certain number of peremptory challenges is not, as Pursley claims, "structural error." Pursley was not denied an impartial jury as a result of the limited number of peremptory challenges and has no constitutional claim.

## III. Pursley was denied a fair trial by prosecutorial misconduct during arguments.

Pursley's direct appeal addressed only one of the instances of improper argument raised in his habeas petition, the prosecutor's calling him an "executioner" in his opening statement. Pursley's appellate brief did not raise this as a constitutional issue, citing neither the Constitution nor federal case law. See Pet. Dir. App. Br. at 45-47. Even assuming Pursley sufficiently alerted the Illinois courts to a constitutional claim, the Illinois Appellate Court reasonably rejected it:

> [P]rosecutors may not engage in inflammatory arguments designed solely to arouse the passions of the jury. [Citation] Nevertheless, improper remarks generally do

not constitute reversible error unless they result in substantial prejudice to the accused.

* * *

In the present case, the prosecutor referred to Pursley as an "executioner" in his opening statement. According to the dictionary, an executioner is "one that puts to death." [Citation] From the facts in this case, we find that the prosecutor could have drawn this inference. Moreover, we do not believe that the word "executioner" carries the same connotation as other remarks found to be reversible error. [Citations]

In this case, the prosecutor used the word "executioner" once, and this occurrence was in his opening statement. Consequently, the word at issue was an isolated remark that was not dwelled upon further by the prosecutor. [Citation] Moreover, in his opening statement, defense counsel reiterated that opening statements were not evidence, but that opening statements are only a "sketch of what * * * the evidence [the prosecutor] believes will show." Indeed, defense counsel even addressed the jury concerning the prosecutor's use of the word "executioner" and warned the jury not to let "emotions and sympathy" get in the way of Pursley's right to a fair trial. Thus, we find that the prosecutor's remark, even if it was inappropriate during the opening statement, does not constitute reversible error because it was not a material factor in Pursley's conviction.

*People v. Pursley*, 672 N.E.2d at 1256.

The court applied the proper standard. "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (*quoting Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). While calling Pursley an "executioner" suggested not only that he caused the victim's death, but that he did so dispassionately and deliberately, that characterization was consistent with the evidence that the victim was shot without provocation. In any event, opening statements are separated from jury deliberations by the entire length of the trial. It would be absurd to suppose that the prosecutor's statement so poisoned the jury's mind that it could not fairly weigh the evidence.

Pursley's other criticisms of the opening argument are defaulted because they were not raised on appeal and they are meritless in any event. Pursley objects that the prosecutor stated that Crabtree was afraid of Pursley, "but we are going to try to get the truth out of her." Anticipating that Crabtree might be uncooperative, the prosecutor was preparing the jury for the state's explanation -- that she was afraid of Pursley. Pursley's counsel could and did argue the opposite, that Crabtree's statement to the police was coerced, while her recantation was truthful.

Pursley claims that the prosecutor's recounting Crabtree's statement that Pursley had threatened her was "hearsay," but rules of evidence do not apply to arguments of counsel. The admission of Crabtree's statement itself will be addressed below.

Pursley's objections to the prosecutor's closing argument are also both defaulted and insubstantial. The prosecutor was entitled to refer to Crabtree's statement and attack her recantation as unworthy of belief.

### IV. Pursley was denied due process when the trial court did not enforce its ruling from a *Motion In Limine* preventing the use of other crimes evidence.

This claim involves admission of several items of evidence. None violated a motion in limine precluding the introduction of evidence of other crimes other than for impeachment.

First, Pursley objects to admission of Diane Winter's testimony that Pursley had asked her to buy bullets for Samantha Crabtree's gun, saying he did not want Crabtree to buy them so they couldn't be traced to her. This was raised on direct appeal as a state law claim and treated as such by the Illinois Appellate Court. Even assuming that a federal claim was fairly presented to the state courts, it is meritless.

A violation of state evidentiary rules is not grounds for habeas relief unless it denied the defendant his right to a fundamentally fair trial. *Howard*, 185 F.3d at 723-24; *Abrams v. Barnett*, 121 F.3d 1036, 1042 (7th Cir. 1997). Evidence of the propensity to commit crimes, or even other crimes committed by the defendant, will rarely amount to a constitutional violation. *Watkins v. Meloy*, 95 F.3d 4, 6 (7th Cir. 1996); *Stomner v. Kolb*, 903 F.2d 1123, 1129 (7th Cir. 1990). Such evidence is normally excluded because it is both prejudicial and irrelevant, but, as the Illinois Appellate Court recognized, Winters' testimony here was not irrelevant. The state contended that the murder had been committed with Crabtree's gun; Winter's testimony showed that Pursley knew of the gun, had access to it, and did not want bullets fired from it traced to Crabtree.

Second, Pursley objects to "police testimony in reference to going back and searching for evidence pertaining to other police investigations." Pet. at 22. Third, Pursley objects to "numerous references to an armed bank robbery." Pet. 22-23. Neither of these claims were raised in Pursley's direct appeal and they are defaulted. On the merits these claims are frivolous. There was no objection to the testimony concerning additional evidence. Such evidence was not specified and the testimony, in context, was relevant to Crabtree's recantation of her statement

against Pursley. The references to a bank robbery by Crabtree were brought out by Pursley's counsel as a suggestion for the reason Crabtree gave a statement against Pursley.

Fourth, Pursley objects to two of Windham's statements: that Pursley told him that before he went back to the penitentiary he, Pursley, would know who had betrayed him, and that Pursley had told him he wanted Windham to "start doing more crimes." This claim was raised in Pursley's direct appeal, again solely as a matter of state law. Assuming that it is properly before this court, it is meritless.

Windham's first statement was properly admitted. It was elicited by Pursley's counsel in an attempt to discredit Windham by asking why he delayed in reporting Pursley's admission that he had shot Asher. Pursley's counsel was attempting to show that Windham had been motivated to fabricate his story by the prospect of reward money and a lenient disposition of his pending criminal charges. This entitled the state to present its own explanation, that Windham came forward because he was threatened by Pursley. Windham's second statement, that Pursley meant that he would have to "start doing more crimes" with Pursley, was improper because it recounted Windham's interpretation rather than Pursley's words, but the trial judge sustained counsel's objection and told the jury to disregard it.

It was for the jury to decide whether Windham had concocted a story to incriminate Pursley in exchange for reward money or leniency from the state. Pursley had a fair opportunity to attack Windham's credibility, and letting the jury hear incidental details of what Pursley claimed was a complete fabrication hardly denied him a fair trial.

Fifth, Pursley objects to Crabtree's statement that detectives interrogating her said she was a "good person," implying that Pursley was a criminal. This was not raised in Pursley's direct appeal and is defaulted; it is also frivolous. If anything, this supports Pursley's version of the story, that the police worked on Crabtree's emotions to induce her to give the statement incriminating him.

Sixth, Pursley objects to the testimony of officer Gillardo that he had received a radio dispatch that Pursley was carrying a shotgun. This was raised in Pursley's first post-conviction petition solely as a matter of state law. While the mention of the shotgun was unnecessary and arguably prejudicial, it did not deny Pursley a fundamentally fair trial.

Seventh, Pursley objects to the use of a portion of Crabtree's written statement in which she stated that on the night of the murder she and Pursley were looking for a house to rob. This

claim is also defaulted and frivolous. This statement was not evidence of other crimes, but directly related to the crime at issue.

### V. The trial court erred in allowing Samantha Crabtree, a State's witness, to be impeached with a crime she never committed.

Pursley complains that he was prejudiced when the jury learned that Crabtree had been charged with armed bank robbery, since the jury could have inferred that he was also involved. This was not raised on direct appeal and is defaulted. It, too, is frivolous. The bank robbery charge was raised by Pursley's counsel to explain Crabtree's earlier statement incriminating Pursley, suggesting that Crabtree incriminated Pursley to avoid prosecution. Pursley cannot simultaneously use the charges against Crabtree to explain her testimony against him while complaining that he was prejudiced by the suggestion that she was involved in crime.

### VI. Pursley was denied a fair trial, his right to confront witnesses, and due process by the trial court's allowing into evidence a letter from the Winnebago County State's Attorneys Office to Samantha Crabtree's attorney.

This claim was raised for the first time in Pursley's post-conviction petition, rather than on direct appeal, so it is defaulted, and it was presented as a violation of Illinois rules of evidence, not as a federal claim. It is also frivolous. Pursley refers to a letter on official letterhead stating that if Crabtree testified to what the State's Attorney believed to be the truth, the State's Attorney would recommend that she receive probation on her bank robbery charge. Pursley does not explain how this was prejudicial. It was in Pursley's interest to show that Crabtree was motivated to cooperate with the prosecution in order to obtain lenient treatment for herself.

Pursley claims the letter violated legal ethics by expressing the writer's personal opinion as to Pursley's guilt. But this was not a case of an attorney invoking personal credibility before a jury; it was the official position of the State's Attorneys Office. It was hardly prejudicial for the jury to learn that the State's Attorney took the position that Pursley was guilty.

### VII. Pursley was denied a fair trial by the admission of evidence of a bank robbery where a juror was a bank manager.

This claim was initially raised in Pursley's post-conviction petition and so is defaulted; it is also frivolous. The juror was a "head teller supervisor," not a bank manager, Tr. 427. Pursley

was not charged with bank robbery. At the time of jury selection, all that could have been anticipated was that the jury might learn of the robbery charge against Crabtree. Since a motion to excuse the juror for cause would have failed, Pursley's counsel can be faulted only for not excusing her through a peremptory challenge. It is doubtful that failure to exercise a peremptory challenge against a juror who could not be challenged for cause could amount to ineffective assistance of counsel, and Pursley has not established any foundation for such a claim.

### VIII. Pursley was denied a fair trial by the admission of certain evidence.

Pursley lists six items of evidence he contends were improperly admitted. None of these claimed errors was raised on direct appeal. A violation of evidentiary rules is not grounds for habeas relief unless it deprived the defendant of a fundamentally fair trial, meaning that the error resulted in a significant likelihood that an innocent person has been convicted. *Howard*, 185 F.3d at 724. This standard is not met.

Pursley objects to the admission of the Taurus handgun recovered from Crabtree's home, complaining that Crabtree did not identify the gun at trial. She did not need to; other evidence tied the gun to Crabtree, and showed that Pursley had access to it. Pursley's claim that the "defense experts proved that the ballistics from the gun did not match the shells and slugs found at the crime scene" ignores contrary testimony by the state's expert.

Next, Pursley objects to photographs taken at his and Crabtree's home showing a box for another gun and a police scanner. This was minimally prejudicial, since the jury could have tied the guns to Crabtree rather than Pursley. As discussed above, it was to Pursley's advantage that the jury learned that robbery charges were pending against Crabtree, and the jury could have believed the guns were hers.

Pursley objects to the admission of a black hooded jacket with buttons found at Crabtree's home, since George had testified that the robber wore a dark blue hooded jacket that was partially unzipped. It was up to the jury to decide whether the jacket found at Crabtree's home could have been the jacket worn by the robber. The court does not understand how Pursley could have been prejudiced by the admission of a jacket that differed from George's description. The same can be said for the admission of two pairs of black jeans taken from Crabtree's apartment; George had testified the robber wore blue jeans.

17

Finally, Pursley objects to posed photos of Crabtree at the crime scene, complaining that the photos did not represent conditions at the time of the crime. He does not allege that the jury was not told that the photos had been taken months later, or explain how this prejudiced him. Even considered together, all of these evidentiary objections are so trivial as to be frivolous.

## IX. Pursley was denied due process by the state's knowing use of perjured testimony.

This claim is defaulted because not raised on direct appeal. It is also frivolous. Pursley claims Windham committed perjury on the evidence of Joyce Tickner's testimony that the adjudicatory hearing on Pursley's unemployment claim was held April 8, 1993, while Windham had testified to an angry phone call by Pursley about April 5, and there was no record of a hostile or threatening phone call from Pursley. First, while Tickner's testimony casts doubt on Windham's story, it does not disprove it. Absence of a record is not proof that something did not occur. Second, hearings are scheduled only after an initial denial of benefits, and it could have been the initial denial of benefits that angered Pursley. Third, inconsistencies in collateral matters do not establish that the state knew or should have known the testimony to be perjured. The alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence. *Tayborn v. Scott*, 251 F.3d 1125, 1130-31 (7th Cir. 2001).

Pursley makes the same argument as to Crabtree's testimony. The state knew that Crabtree had repudiated her written statement and grand jury testimony, but this hardly establishes that the state knew or should have known it was false. As he has done throughout his petition, Pursley asserts that evidence that might create a reasonable doubt of his guilt proves his innocence. Crabtree's and Windham's inculpatory statements may have been false. But the state was not required to believe them false, and neither was the jury.

## X. Pursley was denied due process by the denial of his pre-trial motion that the court make a threshold determination of the reliability and voluntariness of Crabtree's prior statements.

This issue was raised on direct appeal as a matter of Illinois law. The Illinois Appellate Court held that because Crabtree's prior inconsistent statements incriminating Pursley satisfied 725 ILCS 5/115-10.1, no additional evidence of reliability was required. *People v. Pursley*, 672 N.E.2d at 1257. Even if Pursley had preserved this issue for habeas review by raising it as a

matter of constitutional due process, his rights were not violated. Both Crabtree and prosecution witnesses testified concerning the circumstances surrounding the giving of the prior statements and it was for the jury to decide whether to believe them in spite of Crabtree's recantation. There was evidence permitting the jury to find that her prior statements were voluntary and reliable, and there is no constitutional requirement that the court exercise its own independent judgment. *See Johnson v. Washington*, 119 F.3d 513 (7th Cir. 1997).

### XI. Pursley was denied due process when the court allowed detectives to testify concerning Samantha Crabtree's prior statements to police.

Pursley objects to the testimony of police detective Mark Schmidt that Crabtree had told them that Pursley had threatened her if she talked to the police. Pursley's counsel did not object at trial and this claim was not raised on direct appeal, and is defaulted. This is not, as Pursley contends, double hearsay. It was not offered for the truth of Pursley's statement; it was offered to show that Crabtree felt threatened, not that Pursley would actually have killed her. It was an out-of-court statement by Crabtree, and so stands on the same footing as her written statement.

Even assuming that Illinois evidence rules were violated, the improper admission of hearsay is not a denial of due process. The Due Process Clause incorporates the Sixth Amendment right of a criminal defendant to confront witnesses against him, and so limits the use of hearsay as evidence of guilt. But where, as here, both the officer reporting Crabtree's statement and Crabtree herself were available for cross-examination, the statement presents no Confrontation Clause problem. *See California v. Green*, 399 U.S. 149, 155-56 (1970); *Johnson, supra*.

### XII. Pursley was denied a fair trial where the trial court admitted hearsay concerning Pursley's arrest.

This claim repeats Pursley's objection to Officer Gillardo's statement that he responded to a radio dispatch that Pursley had been seen carrying a shotgun. This has been addressed above.

### XIII. Pursley was denied due process by the trial court's allowing into evidence Samantha Crabtree's statements to police and grand jury.

This claim has been addressed above, and no further discussion is necessary.

## XIV. Pursley was denied due process and a fair trial due to cumulative errors.

These alleged errors have been addressed individually above. The court does not find that these alleged errors taken together denied Pursley a fundamentally fair trial.

## XV. The state failed to prove all essential elements beyond a reasonable doubt.

This issue was raised on direct appeal. The Illinois Appellate Court properly applied the test laid down in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979): "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Pursley*, 672 N.E.2d at 1257. This test is highly deferential to the trier of fact, and requires far more than a showing that a rational judge or jury *could* have had a reasonable doubt.

Pursley's argument ignores the requirement that the evidence be viewed in the light most favorable to the prosecution. This requires, among other things, that the conclusion of the state's ballistics expert, rather than Pursley's, be accepted, that the discrepancy between George's description of Pursley's clothing and the clothing recovered from Pursley's home be attributed to poor visibility at the time of the crime, and that Crabtree's initial testimony be believed rather than her recantation. The Illinois Appellate Court's ruling was not an unreasonable application of the *Jackson* standard.

## XVI. Pursley received ineffective assistance of counsel at trial.

This claim, consisting of a number of asserted instances of ineffective assistance, was not raised on direct appeal, but was first raised in Pursley's first post-conviction petition. In affirming the dismissal of Pursley's first post-conviction petition, the Illinois Appellate Court stated:

> We note that most of the conclusions reached by the defendant in his post-conviction petition are either not supported factually by the record or are not supported by appropriate case law. Furthermore, all of the issues raised by the defendant in his post-conviction petition, with the exception of his ineffective assistance of appellate counsel claim, were either raised in his direct appeal [citation] and are now *res judicata*, or could have been raised, but were not, and are therefore waived. [Citation]

20

Resp. Exh. J at 4. Because the Illinois Appellate Court did not address the claims individually, it is difficult to assess its reasons for rejecting them and to determine whether each rejection rests on an adequate and independent ground. Dismissing a claim for lack of support in the record is a determination on the merits, but this cannot apply to a claim based on extrinsic evidence not in the record. Failure to support a claim with case law, as required by Illinois Supreme Court Rule 341(e)(7), would appear to be an independent and adequate procedural ground. Nevertheless, in *United States ex rel. Jellis v. Briley*, No. 00 C 50394, 2001 WL 640972 (N.D. Ill. 2001), this court questioned whether this rule is sufficiently "firmly established and regularly followed" so as to be adequate, *see James v. Kentucky*, 466 U.S. 341, 348-51 (1984), and found that its independence of the merits is compromised by courts' regular practice of excusing non-compliance "in exercise of a reviewing court's responsibility for a just result," *Hux v. Raben*, 230 N.E.2d 831, 832 (Ill. 1967).

That leaves *res judicata* and waiver as potential independent state law grounds of decision. Because we agree that Pursley received effective assistance of appellate counsel, *res judicata* and waiver do apply to claims that could have been raised on direct appeal. However, as noted above, Illinois courts have consistently held that *res judicata* and waiver do *not* bar claims resting on grounds not appearing in the trial record. Accordingly, this cannot be an adequate state ground as to such claims, and this court will consider them.

First, Pursley claims his counsel was ineffective in failing to conduct a proper investigation and interview his alibi witnesses prior to trial. Pursley does not state what additional evidence would have been discovered. He complains that counsel should have interviewed his alibi witnesses earlier, so that the state could not argue that they had only recently come forward. Defense attorneys have numerous cases to attend to. If counsel properly investigates the case prior to trial, he should not be faulted for not doing it earlier than necessary.

Second, Pursley complains that his counsel did not obtain a receipt for a chemistry set Pursley bought for his son Anthony's birthday, and did not seek to admit a photograph taken at the birthday party showing the wrapped chemistry set, the children, and Crabtree. Anthony's mother testified that Anthony received the chemistry set on March 29, 1993, R. 2009, while the murder occurred on April 2, 1993. Testimony corroborating that Anthony had a party and received a chemistry set four days earlier would have been irrelevant as to Pursley's whereabouts at the time of the murder.

Third, Pursley complains his counsel did not introduce evidence that Pursley and Crabtree had received approximately $3000 from tax refund checks and Crabtree's sister a few weeks before the murder, tending to show that Pursley was not in need of money at the time. Pursley does not offer copies of the checks or other proof that this evidence in fact existed and was available to his counsel. In any event, like the chemistry set, it was a collateral matter. Under *Strickland*, 466 U.S. at 689, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that counsel's decisions "might be considered sound trial strategy." Since Pursley chose not to testify, evidence of this income would have had to have been introduced through Crabtree. Assuming the trial judge would have found such evidence relevant enough to admit it at all, admitting it would have permitted the prosecution to cross-examine Crabtree regarding their sources of income and expenditures. Evidence presented at sentencing indicated that Pursley was in the drug business, Pet. App. Br. at 20-21, so it would have been well within the range of sound professional judgment to leave this stone unturned.

Finally, Pursley complains that his counsel did not present witnesses who would have testified that shortly after the murder the police were searching for someone wearing tennis shoes, while Pursley had been wearing combat boots. Pursley offered very little in support of this claim in the state courts. Appealing from the summary dismissal of his post-conviction petition, Pursley provided an affidavit of Antrone Turner, one of the individuals questioned in connection with the murder whose shoes were checked. The affidavit, however, does not state that Turner told Pursley or his counsel of this before trial. It does not even state that Turner was wearing tennis shoes. Pursley also offered his own affidavit stating that he spoke with Sean Baremore (also spelled Barmore) and Baremore's mother, who told him the police looked at Sean's tennis shoes. Pursley provided no affidavit from Baremore. Pursley's affidavit does not state when Pursley spoke with Baremore, nor when he communicated this to his attorney.

If Pursley's counsel had called these individuals to testify, it would have shown that early in the investigation certain police officers had thought the perpetrator had been wearing tennis shoes. Defense counsel elicited evidence indicating that the perpetrator was wearing tennis shoes through Bodell's testimony of a suspicious character lurking near the dumpster and then fleeing, and the tennis shoe prints found near the dumpster. Pursley's counsel was able to put that evidence before the jury as well arguing this evidence to the jury. Counsel's argument depended

on persuading the jury that (a) the man Bodell saw was the murderer, and (b) the man was not Pursley. Turner and Baremore could not have offered testimony supporting either proposition. Thus, their testimony would have added little to the defense.

## ADDITIONAL CLAIMS RAISED IN THE SUPPLEMENTAL PETITION

**A. Pursley was denied ineffective assistance of post-conviction counsel in prosecuting his first post-conviction petition.**

This claim could not have been raised in Pursley's first post-conviction petition, and the Illinois courts denied it on the merits. We cannot address it, because there is no constitutional right to counsel in post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Pitsonbarger v. Gramley*, 141 F.3d 728, 739 (7th Cir. 1998).

**B. Pursley was denied effective assistance of appellate counsel because counsel did not include certain photographs in the appellate record.**

This claim was raised in part in Pursley's first post-conviction petition. To the extent it was raised in the first post-conviction petition, it is denied for the reasons given above. To the extent it was not previously raised it is defaulted.

**C. Pursley's Fourth Amendment rights were violated because there was not probable cause to issue a search warrant based on an informant's tip.**

**D. The trial court denied Pursley's Fourth Amendment rights by failing to conduct a *Franks* hearing to determine the truthfulness of the statements underlying the warrant.**

**E. The trial court denied Pursley's Fourth Amendment rights by admitting evidence seized in violation of the Fourth Amendment.**

**F. The trial court denied Pursley due process by admitting the statement of Marvin Windham without a threshold determination of reliability and trustworthiness.**

**G. Pursley was denied due process when the prosecution improperly put forth evidence of flight without proper proof of consciousness of guilt.**

**H. Pursley received ineffective assistance of trial counsel because counsel failed to raise issues C-G above at trial.**

**I. Pursley received ineffective assistance of appellate counsel because counsel failed to raise issues C-G above in his direct appeal.**

All of these claims could have been raised in Pursley's first post-conviction petition, if not earlier. Illinois courts consistently treat such claims as waived, *see Whitehead*, 662 N.E.2d at

311, and did so here. Because this is an adequate procedural ground independent of the merits of any constitutional claim, these claims are procedurally defaulted. *Coleman*, 501 U.S. at 729; *Schaff*, 190 F.3d at 524. As Pursley had no constitutional right to assistance of counsel in pursuing post-conviction remedies, the default cannot be excused by a claim of ineffective assistance of counsel. The court accordingly cannot reach these claims.

As all of Pursley's claims are either defaulted, meritless, or both, the court denies the petition for writ of habeas corpus and grants respondent's motion to dismiss.

IT IS SO ORDERED.

JUDGE PHILIP G. REINHARD
UNITED STATES DISTRICT COURT

DATED: _June 18, 2002_